WILLIAM HIGH v. QUINCY, OMAHA & KANSAS CITY RAILROAD COMPANY, Appellant.—300 S. W. 1102.

Division One, December 7, 1927.

446

*J. G. Trimble, S. L. Sheetz* and *H. J. Nelson* for appellant.

*Davis & Ashby, Platt Hubbell* and *Geo. H. Hubbell* for respondent.

GANTT, J.—Plaintiff was the night car-inspector of defendant at Milan, Missouri, and this is a suit for personal injuries alleged to have been received by him while in the performance of his duty to couple an engine to a baggage car of a train due to leave Milan for

Kansas City. Every morning (except Sunday) passenger trains left Milan for Kansas City and Quincy. At 3:30 A. M. on the 27th of November, 1923, engines 475 and 469 were coupled together near the roundhouse in Milan by the hostler and hostler helper. They were "steamed up," ready to pull these trains out of Milan. The hostler, acting as engineer on 475, moved the engines north on track 5 by pulling engine 469, unmanned, with the power of engine 475, to the water crane, where the hostler helper filled the tanks with water. Thereafter the engines, with the power of 475, were backed on track 2, to couple engine 469 to the baggage car, then standing with a passenger coach on said track. Plaintiff gave an easy back-up signal with his lantern. The hostler responded by moving the engines slowly backward until engine 469 engaged the baggage car, for the purpose of coupling the engine to the car. They did not couple. Thereupon, plaintiff gave a stop signal, and the hostler responded by stopping the engines, leaving a space of about twelve inches between the drawbar of the engine and the drawbar of the car. Plaintiff went between the engine and the car to adjust the coupler of the engine. In doing so he removed the knuckle pin with his left hand, removed the knuckle and held it against the coupler head with his right side, and with his right hand was interlocking the knuckle with the interlocking pin when either engine 469 moved backward or the car moved forward and he was caught between the drawbars and injured. While plaintiff was standing between the drawbars working with the coupler, the hostler helper, Kelsey, uncoupled the engines and gave a signal to the hostler to go ahead, which was done, leaving engine 469 with no one in control of it. It was the purpose of the hostler and hostler helper to back engine 475 onto track 1 and couple it to the passenger train bound for Quincy. Judgment was for $30,000, and defendant appealed. Other facts will be noted.

The first count of the petition is under the Federal Employers' Liability Act. Respondent dismissed as to this count at the close of the evidence. The case was submitted on the second count, and the negligence therein charged is as follows:

(a) That the defendant negligently furnished for the use of plaintiff engine 469 which was defective in its coupling apparatus, would not couple automatically and could not be coupled without adjustments by an employee going between the engine and the car.

(b) That the hostler helper negligently failed to be at the rear of the rear engine at the time the coupling was to be made, but stationed himself at the head of the rear engine at said time, and the hostler in charge of the head engine, with knowledge that the hostler helper had failed to perform said duty, negligently received and acted upon signals from said hostler helper to move the head engine from the rear engine without ringing the bell and sounding the

whistle of said engine, and that said hostler and hostler helper negligently uncoupled and moved the head engine without a signal from plaintiff so to do, and that the rear engine was thereby negligently left under a full head of steam on said track unblocked, without brakes and with no one in charge of it.

(c) That the steam apparatus and machinery of the rear engine was defective, thereby permitting the escape of steam into the cylinders, which fact was known to the defendant or by the exercise of ordinary care on its part could have been known, and that an open leaky throttle valve negligently permitted steam to escape into the cylinders, which fact was known to the defendant or by the exercise of ordinary care on its part could have been known—all of said defects and acts of negligence caused the rear engine to move and thereby crush the plaintiff between the drawbars of said engine and car.

The answer was a general denial.

I. Appellant contends the court should have given its instruction in the nature of a demurrer at the close of all the evidence "because there was an entire failure of proof to support the allegations of negligence on the part of defendant."

It is argued respondent alleged and testified he was caught by the movement of the engine backwards; that the only allegation in the petition of a cause for the movement of the engine was by steam leaking into the cylinders, and that respondent wholly failed to make any proof of a defect in the engine that might have caused said movement, or any proof that the movement of the engine resulted from steam in the cylinders. The facts are as follows:

In the steam dome of the engine a perpendicular pipe connects with a horizontal pipe which runs toward the front of the engine, where it connects with pipes running on both sides of the engine to the cylinders. Two months before respondent was injured the U-bolt connecting these pipes in the steam dome was loose, thereby permitting steam to leak through the pipes to the cylinders, which fact might cause the engine to move. Appellant's evidence tends to show the engine was taken out of service for a day; the steam leak repaired, and thereafter no steam leaked into the cylinders. Employees made reports in writing of work done and materials used in making repairs on the engines at Milan. Many such reports were produced at the trial showing work done and repairs made of minor importance on this engine, but no written report was produced of this important work. The machinists in the service of appellant at Milan were not finished machinists. They served no time as a machinist apprentice. The jury was not bound to believe the testimony of appellant's witnesses that they repaired the steam leak. The fact

that no written report was made of the work is a circumstance for the consideration of the jury in passing on this question. In addition, if they believed work had been done, they might find it was not properly done and that steam continued to leak into the cylinders. Either the engine moved or the car moved. Respondent testified the engine moved. On the facts the condition of the engine at the time was a question for the jury. [Gannon v. Gas Co., 145 Mo. l. c. 514, 46 S. W. 976; Union Trust Co. v. Hill, 283 Mo. l. c. 282, 223 S. W. 434; Anderson v. K. C. Ry., 290 Mo. l. c. 8, 233 S. W. 203; State ex rel. v. Ellison, 286 Mo. l. c. 232, 226 S. W. 557.]

But appellant insists that even though steam did leak at the U-bolt in the steam dome, it could not reach the cylinders for the reason the reverse lever was on center. Hostler Duncan did not testify the reverse lever was on center. He testified the reverse lever was near center. The contention is overruled.

II. Appellant contends there was no proof of any specific defect in the coupler of the engine. Respondent testified the tail of the knuckle of this coupler would not automatically slip behind the locking pin and thereby interlock, making the coupling; that the locking pin would not fall down and interlock. Three days before respondent was injured this condition was reported by respondent to night machinist Mullins, whose duty it was to repair the coupler. Respondent told Mullins he thought the locking pin on this coupler was bent and that he had difficulty in making a coupling. Mullins stated that he would not hold the engine out of service for that reason and instructed respondent to interlock the engine coupler, open the knuckle on the baggage car and make the coupling from that end. The night before respondent was injured the engine and baggage car did not couple automatically, and respondent made the coupling in the manner directed by machinist Mullins. After respondent was injured Walter Harris, car foreman, ordered Layton High, appellant's car repairer, to remove this Major coupler and install a Sharon or Complex coupler, which was done. About this time machinist Mullins made the statement that this Major coupler needed repairs, and foreman Harris stated that Major couplers would not couple automatically one time out of ten. We think the question was for the jury, and the contention is overruled.

III. It is contended respondent was guilty of contributory negligence as a matter of law. In the second count of the petition it is alleged as follows:

"The plaintiff bases and founds his right of recovery on the second count of his first amended petition herein on the Laws

of Missouri alone, and makes no claim in this, the second count of his petition, under or by virtue of any Laws of the United States.''

Because of this allegation it is insisted that respondent waived all rights under the Federal Safety Appliance Act. Respondent contends that by this allegation he did not intend to waive said rights, but to make clear that under this count of the petition he did not seek a recovery under the Federal Employers' Liability Act. If appellant's position is correct, then contributory negligence, if any, would bar a recovery as a matter of law. We will assume, without deciding, that respondent waived all rights under the Federal Safety Appliance Act. On demurrer the facts relating to the conduct of respondent in making the coupling are admitted as follows: On signal from respondent the hostler Duncan, acting as engineer on engine 475, stopped the engines when engine 469 and the baggage car failed to couple. They had no right to move engine 475 without a signal from respondent. The evidence tends to show he gave no signal to move either or both engines. He proceeded to adjust the coupler on engine 469, believing the engines would not be moved without a signal from him. While no one was in charge of engine 469 it was coupled to 475, which fact held it stationary on the track. There was nothing to indicate to respondent that hostler helper Kelsey would uncouple the engines and signal hostler Duncan to move engine 475. The evidence tends to show it was the duty of hostler helper Kelsey to be at the rear of engine 469 that he might know if the engine and car coupled. We think the issue of contributory negligence was a question for the jury.

IV. Appellant contends the court was in error in permitting respondent to testify that if he had known engine 475 had been uncoupled from engine 469 he would have ''got out of the way—got from between the engine and car.'' It is claimed this evidence is a mere argument and self-serving conclusion. Appellant cites no authority to sustain its contention. We think the evidence was admissible on the issue of contributory negligence. It tends to show respondent would not have gone between the engine and the car if he had known engine 469 with ''steam up'' and unmanned was uncoupled and disconnected from engine 475. [B. & C. Bridge Co. v. Cartrett, 13 S. W. l. c. 9; Hendrix v. United Rys. Co., 193 S. W. 814; Great Northern Ry. v. McLaughlin, 70 Fed. l. c. 672.] The contention is overruled.

V. Appellant complains of the following instruction given at the request of respondent:

''An expert witness is one who is skilled in any particular art, trade or profession, being possessed of peculiar knowledge concerning the

same, acquired by study, observation and practice. Expert testimony is the opinion of such witness, based upon the facts in the case as shown by the evidence, but it does not even tend to prove any fact upon which it is based, and before you can give any weight whatever to the opinion of expert witnesses you must first find from the evidence that the facts upon which it is based are true. The jury is not bound by expert testimony, but it may be considered by you in connection with the other evidence in the case.''

Three physicians examined respondent and gave testimony as to his injuries. Dr. Marty, an X-ray specialist, testified from X-ray plates and gave his conclusions from a reading of the plates. Drs. Moore and Simpson gave testimony from physical examinations, from a reading of X-ray plates, and from a skeleton exhibited before the jury. They testified to an injury in the sacroiliac joint. Dr. Moore testified to an injury to the spine, hips, nervous system and to the muscles along the side of the spine. The conclusions reached by both physicians were based on facts gleaned from physical examinations, inferences drawn from those facts and from a reading of the X-ray plates. In the case of Spencer v. Ry. Co., 317 Mo. 492, 297 S. W. l. c. 357, on similar evidence, we held this instruction to be erroneous. It was there said, by RAGLAND, J.:

''This instruction was taken bodily from Smith v. Telephone Co., 113 Mo. App. 443, 87 S. W. 71, where it had the unqualified approval of the Kansas City Court of Appeals. Nevertheless, it was erroneous, at least as applicable to the evidence in this case. There were some five or six medical experts who testified with respect to plaintiff's injuries—torn or strained ligaments and fractured bones at or just above the ankle joint. They had made physical examinations and they had 'read' X-ray pictures, and from both had diagnosed the conditions of the injured parts. Their testimony consisted of a mixture of the facts they had observed and the inferences they had drawn from those facts. Neither a skilled lawyer nor a trained psychologist, much less a jury of laymen, could have separated with any sort of precision the fact testimony of these experts from their opinion testimony. The first part of the instruction could very properly have been given if the experts' opinions had been based solely on hypothetical facts; but the propriety of giving in any case the direction embodied in the last sentence is extremely doubtful. The opinion of an expert, when admissible at all, is evidence; sometimes it is the only evidence by which proof can be made (O'Leary v. Scullin Steel Co., 303 Mo. 363, 260 S. W. 55) and its value as evidence is always for the jury. [Thompson v. Ish, 99 Mo. 160, 12 S. W. 510, 17 Am. St. 552.] Besides, what reason can there be for singling out the testimony of experts for comment and caution when their testimony must

be considered and weighed just like the testimony of other witnesses? [Morrow v. Gas & Electric Co. (Mo. Sup.), 286 S. W. 106, 116.]''

It should be noted that the jury by the last sentence of this instruction was told that expert testimony *may* be considered in connection with the other evidence in the case. All of the authorities hold that a jury *must* consider expert testimony in connection with the other evidence. The ordinary meaning of the word "may" is "to have permission—to be allowed": Bouvier's Law Dictionary, Rawles (3 Ed.) p. 2168; Standard Dictionary, p. 1092; Anderson's Law Dictionary, p. 666; Webster's New International Dictionary, p. 1333. There is nothing in the context to indicate a meaning other than the ordinary meaning. By this instruction the jury were not required to consider this testimony. For this additional reason we hold the instruction to be erroneous. However, respondent claims the error is harmless. Drs. Moore and Marty who made examinations at the request of respondent, testified that his injuries are permanent and that an operation would be of no benefit to him. Dr. Simpson, who examined respondent at the request of appellant, gave it as his opinion that an operation would be of no benefit to respondent, but further testified that if respondent was put into a well-fitting brace or plaster-paris cast he ought to be well inside of six months or a year. Dr. Brummitt was the first physician called to treat respondent after he was injured. He agreed with Dr. Simpson as to the proper treatment for respondent. Drs. Marty and Moore gave no testimony suggesting a treatment for respondent, but simply testified that an operation would not benefit him. Manifestly, the jury gave no consideration to the testimony of Drs. Simpson and Brummitt relating to the treatment that should be given respondent. If they had done so, they could not have returned a verdict for $30,000. In view of this testimony and the amount of the verdict, we cannot say the instruction was harmless. Other questions presented will disappear on a retrial of the case.

It follows that the judgment should be reversed and the cause remanded. It is so ordered. All concur.