WILBUR E. CONDUITT, Executor of Estate of M. JESSIE CONDUITT, v. TRENTON GAS & ELECTRIC COMPANY, Appellant.—31 S. W. (2d) 21.

Division One, September 4, 1930.

*Sparrow & Patterson* and *McCune, Caldwell & Downing* for appellant.

*Hubbell Bros.* for respondent.

ELLISON, C.—M. Jessie Conduitt instituted this action to recover damages for alleged personal injuries sustained from a shock received when turning on an electric light in her residence in the city of Trenton. She recovered a verdict and judgment for $20,000, from which the defendant has appealed. The case was tried on an amended petition charging negligence generally, and an answer in the form of a general denial. The plaintiff's death having occurred pending the appeal the cause was revived here in the name of her executor, the respondent herein. References hereinafter made to respondent are intended to apply to the plaintiff, who was the original respondent. The assignments of error on this appeal complain of the overruling of appellant's demurrer to the evidence, of the admission and exclusion of evidence, of the misconduct of the jury, of the giving and refusal of instructions, of the size of the verdict, and the argument of respondent's attorneys.

The evidence tended to show that at the time of the alleged accident and long prior thereto the appellant owned and operated an electric light plant and a system of poles, wires, transformers and other equipment for the generation and distribution of electric current for light and power in Trenton, and had no competitor in that enterprise in that city. The respondent was a resident of Trenton and her residence was supplied with electric current by the appellant for compensation. The current was conducted over

appellant's service wires to the outside of the building, at which point the wires were connected with the interior wiring of the house. The latter, with the lighting appliances, had some years before been installed by respondent's predecessor in title. The appellant's system of wires in the immediate vicinity of respondent's residence consisted, first, of a primary line carrying 2300 volts of electricity and running from the generating plant to a transformer located about two blocks away. By means of the transformer the current was reduced to 110 volts for use in the residence served by that circuit, and was conducted thereto over the service wires aforesaid, which were intended to carry and usually did carry 110 volts. These service wires were on cross-arms attached near the tops of the poles, and the cross-arm carried another wire which furnished the current for the street lighting system. At the time in question the street lighting wire was charged with a current of probably 1600 to 1800 volts. The secondary wires were not grounded at the transformer.

Respondent, a spinster thirty-nine years of age, testified in substance that on the evening of August 14, 1924, at about 9:30 o'clock she undertook to turn on certain lights in her residence which were operated by drop chains. When she pulled the chain of the dining room light she ''got a terrible jerking sensation, a shock in her left arm.'' A few minutes later she undertook in the same way to turn on the light in the lavatory under the stairway. ''She had to pull the light socket off the wall in order to get loose. She had that terrible gripping sensation down through her left hand and arm.'' She had taken the chain in her left hand in each instance. When asked about the condition of the floor she answered that she made no examination, but so far as she knew it was dry. She went part way home with her niece, who had spent the evening with her. She testified she did not know what caused the shock. When she arose next morning she discovered that ''her left eyelid was drooping and the vision of the eye was blurred; her left hand and arm were numb and there was a numbness down her back on the left side; the hand began to pain immediately; it pained all the time and gradually grew worse.''

Afterwards she had a soreness in her chest. She had never experienced any of these pains or symptoms before. Her left hand and arm gradually became smaller, and by autumn of 1925 the left arm had become much shrunken and the muscles of her left shoulder had wasted away. Respondent did not consult a physician until two weeks after the accident. She attributed the delay to the fact she did not at the time think the shock was serious, and to her belief in Christian Science. She consulted her physician, Dr. Moore, several times in September, once in November, 1924, and occasionally thereafter until the close of the year 1925. She worked more or

less from the time of the accident down to Christmas, 1925; but with an impaired ability due to the condition described. While on a visit in Oklahoma in early February, 1926, she became paralyzed from the waist down. On the ninth day of that month she was taken to the Mayo clinic at Rochester, Minnesota, for examination and treatment, remaining there seven or eight days. Returning to Trenton she entered a hospital whence she was brought on a stretcher to the trial in May, 1926, to give her testimony. A few months thereafter she died.

From the year 1902 down to the year 1925 the respondent on several occasions consulted oculists for the purpose of being fitted with glasses for far-sightedness. In 1914, an exophthalmic goiter was removed from her neck. In 1919, a cancerous tumor located a few inches above her left breast was removed, also a mole on her face. At the same time her tonsils were removed. These various operations appeared to be successful and her recovery was apparently complete. During the next five years and to the time of the accident she felt and appeared to be strong and vigorous; gained some fifteen pounds in weight and was heavier than she had ever been; did various kinds of work, such as clerking at times, at other times doing her housework, making bread for sale, tending her garden, mowing her yard, and so forth.

Dr. Moore testified that when respondent consulted him first after the accident her health had been good for some years; that on that occasion she had a condition he had never observed before. (He had several years before fitted her with glasses.) She complained of her vision and want of sensation in her left hand and arm. There was a marked drooping of her eyelid and a contraction of the pupil. He kept her under observation until she went to Oklahoma. When he had last examined her eyes, in December, 1925, she had one-sixth vision in the left eye and normal in the right. She was decidedly more nervous after the accident, and within a few months the atrophy of the arm began. She had a condition that was produced suddenly and the shock as described by the respondent was in his opinion sufficient to produce it. He further testified that a latent cancer could be activated into actual and earlier growth by a strong electric shock, and it is highly probable that it would be. Dr. O. R. Rooks gave similar testimony.

Several witnesses whose residences were on the same electrical circuit with respondent's residence testified that they received shocks when turning on their lights after nine o'clock of the evening of the accident. One of these witnesses by telephone reported the condition to appellant's lineman, Collier, who appeared in response to the call and in testing the lighting appliances was himself slightly shocked.

Being unable to discover the source of the trouble he called the superintendent, Richardson, who came at once. After giving directions to the plant to cut off the current, Richardson and Collier undertook to trace the circuit in order to locate the cause of the trouble. They found a limb had fallen across the street lighting wire and the service wires at a point about two blocks distant from the Conduitt residence. The tree, to which the limb was still partly attached, was inside the line of private property and about eight feet from the wires. The limb was about fourteen feet long and six inches in diameter and constituted the major part of the tree. It had pushed the street lighting wire and one of the two service wires together and was holding them in contact with each other. At the point of contact the wires were covered by a substance referred to by some witnesses as "insulation" and by others as "waterproof covering." It was watersoaked and not burned.

The tree, or the limb, at the place of connection was partially rotten. The limb and its branches and leaves were wet. When the limb was detached and removed by Collier and Richardson the wires resumed their normal relative positions, though with slightly increased slack. The discovery and removal of the limb occupied about thirty minutes. The only means the appellant had to discover that a service wire was carrying a dangerous or excessive current was for an employee to trace the line and discover the cause, unless it should come under the observation of some employee in his work. A grounding of the secondary wires at the transformers would not necessarily take care of an excessive current on such wires. The testimony of Richardson and Collier, the former of whom was a witness for the respondent, is reflected above.

There was no direct evidence as to when the limb fell upon the wires. It was in evidence that certain lights were turned on in respondent's home shortly after six o'clock without mishap. The evidence as to the condition of the weather was to the effect that the day was a very rainy one. It rained hard and there was wind. The storm was very hard in the afternoon and it ceased about six o'clock. The ground was muddy.

Charles D. Fox, an experienced electrician, for ten years superintendent of the St. Joseph light plant, testified for respondent. He said the wires had a mere waterproof covering. Collier said the same. Fox gave it as his opinion that if such covering was wet and the high-voltage wire was in contact with a low-voltage wire, the current would pass from the former to the latter rather than through the limb of a touching tree and thence to the ground; but that if the wires were really *insulated* the current would take the other course. He said in all standard wiring a secondary wire is customarily grounded at the transformer to intercept any excess voltage that may get on the secondary wires, thereby preventing

the same from reaching the buildings of users of current in case electricity escapes from the high-voltage primary wires to the secondary wires. He explained the method of grounding, said it accomplishes the purpose intended and illustrated his explanation with a model. He said such ground wires were in general use in lighting systems and that no system without it was reasonably safe. He further testified that a voltage of 110 is not dangerous, of 500 volts is not deadly and of 1800 is deadly.

The testimony of respondent's witness Billings, an electrician of twenty-five years experience in the management of light plants, among them the plant at Trenton, was much the same. He said the customary method of protecting the secondary or service wires of an electric lighting system is to ground the central wire thereof. A permanent grounding is made by an ordinary pipe six or seven feet long, and a wire soldered into the end of it. He testified that the use of the ground wire had to his knowledge been general for the last ten years. In answer to a proper question hypothesizing the contact of the wires and the conditions mentioned, he further testified that "if this street wire was in contact with the house wire there would be enough excess amperage to bring on quite a shock."

The appellant did not introduce any electrical expert and on the issue of negligence introduced no affirmative defense other than to introduce a piece of wire which was said to be that portion of the street lighting wire at and near the point of contact and to have been removed the next morning after the accident. The affirmative defense was concentrated on the alleged injury and was in substance as follows:

Dr. Frank J. Iuen of Kansas City, testifying as an expert, gave the opinion that a shock of the character described by the respondent could not have caused the drooping of her eyelid, the condition of her hand and arm or the paralysis; that the cancer hereinafter mentioned was the cause. Dr. J. B. Wright of Trenton who made a physical examination of respondent, testified substantially to the same effect.

At the Mayo clinic the respondent at her own instance was examined by six staff physicians working in collaboration. It appeared from the depositions of two of them, Drs. Parker and Lillie, that her condition was diagnosed as due to a cancerous tumor on her spinal cord at the level of the eighth dorsal and first cervical segment, involving the spinal roots on the left side and the cervical sympathetic cord on that side, and the tumor as being probably primary in the breast. Their prognosis was that her condition would continue to get worse. The respondent described to them the accident, the shock and her condition and symptoms since. In their opinion the shock had nothing to do with her condition as developed by their examination; and further there was no imper-

fection in the sight of her eye, and the ptosis or drooping of the eyelid and the condition of her arm and hand were all due to the cancerous tumor. There was nothing about her condition that could not be attributed to the tumor. The tumor had probably existed for years; it might have been a recurrence of the cancer removed in 1919. An electric shock would not in their opinion cause a cancerous tumor, and the shock respondent claimed to have received had nothing to do with her condition as disclosed when they examined her.

Appellant introduced in evidence respondent's abandoned original petition. The parties have taken the position that the amended petition on which the case was tried charged negligence in general terms and that the original charged specific negligence, and the discussion will therefore proceed upon that assumption.

On account of the nature of the questions raised on the appeal the outline above purposely puts the facts in a light as favorable to the respondent as may be.

I. The cause was submitted to the jury on the *res ipsa loquitur* doctrine by respondent's instructions numbered 2 and 3. These instructions are assailed here by the appellant on the grounds: (1) that having charged specific negligence in the original petition, the respondent is precluded from invoking the rules of *res ipsa loquitur*, notwithstanding her amended petition contained only a general plea of negligence; (2) and that by proving at the trial the exact cause of the accident the respondent waived her cause of presumptive negligence.

On the first point we are unable to agree with appellant. No question of estoppel by record can arise on the discarded pleading. After its abandonment it was no longer a part of the record and possessed no qualities of a record. When put in evidence, as it was, its contents became admissions of fact to be considered by the jury along with respondent's testimony and the circumstances attending the accident, but nothing more. And by the amended petition upon which issue was joined the respondent placed herself in position to invoke at the outset of the trial the doctrine of presumptive negligence. [Briscoe v. Metropolitan St. Ry. Co., 222 Mo. 104, 113, 120 S. W. 1162; Orcutt v. Century Bldg. Co., 214 Mo. 35, 51, 112 S. W. 532; Chapman v. Davis (Mo. App.), 287 S. W. 832, 834.]

The second point, however, we think is well taken. At the trial the respondent proved the specific cause of the accident with its contributing factors, viz.: the good condition of the house wiring and lighting fixtures; the close proximity of the tree and its partly decayed limb to appellant's wires; the breaking of the limb and its presence on the wires,

holding them in contact some three and a half hours after the storm had ceased; the want of insulation effective to prevent the charging of the house wires with an unusual and dangerous current; the absence of a ground wire at the transformer to carry off the excessive current; and the appellant's failure to have or to employ means for a prompt discovery of the dangerous diversion of its current into the house wires.

On the issue of negligence the appellant relies for its exculpation on these same facts and circumstances developed by respondent. There was no substantial dispute about how the accident occurred. Furthermore, the respondent's brief contains the unequivocal statement: "Instead of relying upon any presumption, the plaintiff has proved her case by direct evidence." In these circumstances there is no room for presumption and the respondent must be said to have abandoned that theory of submission. [Price v. Met. St. Ry. Co., 220 Mo. 435, 456, 119 S. W. 932, 937; Porter v. St. J. Ry., L., H. & P. Co., 311 Mo. 66, 76, 277 S. W. 913, 916; Gibbons v. Wells (Mo. App.), 293 S. W. 89, 93; Cook v. Union L. & P. Co. (Mo. App.), 232 S. W. 248; Heidt v. People's Motor Bus Co., 219 Mo. App. 683, 688, 284 S. W. 840, 841; McAnany v. Shipley, 189 Mo. App. 396, 176 S. W. 1079; 45 C. J. 1206, sec. 774; 20 R. C. L. 188, sec. 156.]

The doctrine of these authorities is that even though the plaintiff introduce evidence tending to show specifically the cause of the accident the benefit of the rule *res ispa loquitur* will not be waived or lost if by this evidence the cause is still left in doubt or is not clearly shown; but where the precise cause is shown there is no occasion or room for the application of a presumption. The plaintiff is bound by his evidence in a *res ipsa* case just as he would be in any ordinary negligence action and cannot in effect say to the jury, "I have shown you exactly how the accident occurred but you are, nevertheless, still at liberty to speculate and presume it may have happened some other way."

We have in mind the further rule that the presumption of negligence under the doctrine *res ipsa loquitur* is a substantial presumption or inference of *fact* which does not disappear upon the adduction of evidence by the adversary party tending to disprove negligence. [Bond v. St. L.-S. F. Ry. Co., 315 Mo. 987, 1002, 288 S. W. 777, 782.] But that does not mean the plaintiff can fill in all the gaps in his own case and leave nothing to inference, and then recover on some other theory.

Respondent's counsel argue the foregoing does not apply to this case because Miss Conduitt was not an electrician and did not know the cause of the shock she received, and because the detailed and specific facts shown in evidence in her behalf were gathered afterward by her lawyers. The argument is that she (or her exec-

utor now) ought not to lose the benefit of the presumption and be penalized for the industry and research of her attorneys. But that view is founded on a misconception of the purpose of the rule. It is concerned with the kind of showing a litigant is required to make in pleading and proving his case; and if a plaintiff acquaints himself with the facts and presents them at the trial it makes no difference from what source he obtained the information.

II. Appellant further maintains its instructions in the nature of demurrers to the evidence, offered at the close of the plaintiff's case and of the whole case, should have been sustained—that the evidence was insufficient to make a case for her. As regards the cause of the accident, there seems to be a little inconsistency in this contention when it is remembered appellant also argues—and successfully, as we have just decided—that the respondent proved her case *too well* on that point and thereby lost the benefit of any presumption under the *res ipsa loquitur* doctrine. But there do remain, of course, the questions as to whether these proven facts bespoke negligence, and whether the respondent's injuries resulted from the electric shock or from cancer.

We are unable to say as a matter of law the appellant's failure to have the two wires insulated so that current would not escape from one to the other if they came in contact, and the failure to have the house wire grounded, was not negligence. Indeed, under some of the authorities it would seem to be negligence *per se*, regardless of whether or how long appellant had notice of the presence of the limb on the wires before Miss Conduitt was shocked. But we need not go into that question. On the general subject of liability for such conditions see: Thompson v. City of Lamar (Mo.), 17 S. W. (2d) 960, 971, et seq.; State ex rel. City of Macon v. Trimble, 321 Mo. (Div. 1) 671, 12 S. W. (2d) 727, 733; Morrow v. Mo. Gas & El. Serv. Co., 315 Mo. 367, 286 S. W. 106; Solomon v. Moberly L. & P. Co., 303 Mo. 622, 262 S. W. 367; Sanders v. City of Carthage (Mo. App.), 9 S. W. (2d) 813, 816.

With regard to whether the respondent's condition was due to an electric shock or to cancer, there was a sharp conflict in the evidence. The medical testimony for her tended to show the former, and under the decisions it is to be considered substantial, not conjectural. [O'Leary v. Scullin Steel Co., 303 Mo. 363, 372, 260 S. W. 55, 58.] On the whole, respondent made a case for the jury.

III. Respondent's Instruction No. 4 was as follows.:

"An expert witness, is one who is skilled in any particular art, trade or profession, being possessed of peculiar knowledge concerning

the same, acquired by study, observation and practice. Expect testimony is the opinion of such witness, based upon the facts in the case as shown by the evidence, but it does not even tend to prove any fact upon which it is based, and before you can give any weight whatever to the opinion of expert witnesses you must first find from the evidence that the facts upon which it is based are true. The jury is not bound by expert testimony, but it may be considered by you in connection with the other evidence in the case.''

This instruction is assailed by appellant on authority of certain recent decisions of both divisions of this court, wherein it was condemned, viz.: Spencer v. Q., O. & K. C. Rd. Co., 317 Mo. 492, 503, 297 S. W. 353, 356; High v. Q., O. & K. C. Rd. Co., 318 Mo. 444, 451-2, 300 S. W. 1102, 1105; Brees v. C. R. I. & P. Ry. Co. (Mo.), 4 S. W. (2d) 426. The respondent in effect asks that the holdings in those cases be reconsidered, citing some nineteen earlier Missouri cases and a number of others from other jurisdictions, in all of which the instruction or one of similar import was approved or at least passed without criticism. But the questions presented have still more recently been gone over again by this court en banc, in Scanlon v. Kansas City, 325 Mo. 125, 28 S. W. (2d) 84, 94, et seq., and in that case the conclusions reached in the decisions cited above were adhered to. For this reason we hold the instruction was erroneous.

Respondent insists further, however, that even if the giving of the instruction was error, the error was not substantial because by other instructions given at the appellant's request the jury were required to consider all the evidence in the case; and therefore under Section 1513, Revised Statutes 1919, the cause ought not to be reversed and remanded. But we cannot agree to that. The last sentence of the instruction declares the jury are not bound by expert testimony but may consider it in connection with the other evidence. One of the hotly contested issues of fact was whether the paralysis and cancer from which the respondent suffered were due to the electric shock or to certain preexisting physical and nervous ailments. Obviously, on these questions the seasoned opinion of medical experts must be controlling. It was, as said in the Scanlon case, substantial evidence, indeed, practically the only evidence available. This being true, to tell the jury they were not bound by this testimony and may (and therefore may not) consider it, was to strike at some of the most important evidence in the case. And the fact that other instructions admonished the jury to consider all the evidence would not cure the error, because the two directions were inconsistent and left the triers of fact without any intelligible guide.

IV. A few other assignments will be noted, relating to questions which may arise on a retrial. The accident occurred about nine o'clock P. M. on August 14, 1924, following a heavy wind and rain storm which ended some three hours earlier. In January, 1926, respondent had the floor of the lavatory where she received the shock taken up. It was found the boards were wet, partly decayed, and settled down close to the soil pipe; and underneath one of them the sills were saturated and resting on muddy ground. The house was many years old and stood on a spot lower than some other parts of the yard, as appears from a photograph in evidence. Electrical experts were permitted to testify that a person standing on the wet boards of the lavatory would receive a more severe shock than if standing on the dry floor of a house with a solid foundation. And several witnesses whose houses were of the latter type and on the same circuit, told of receiving shocks about the same time and in the same manner.

Appellants insist proof that the floor was wet in January, 1926, was not substantial evidence that the same condition obtained seventeen months earlier, in August, 1924, when the accident occurred. We think the objection is valid—at least on the showing made. While it is the general rule that proof of a condition or situation at a prior time not too remote raises a presumption of its continued existence thereafter until the contrary is shown, yet such presumptions are not retroactive. They do not run backwards, and ordinarily proof of a present condition standing alone is not presumptive evidence of its existence theretofore. [22 C. J. sec. 30, p. 92; 10 R. C. L. sec. 15, p. 873.]

But the presumptions in most instances, and certainly the inferences, to be drawn must depend on the nature of the facts of the case. Thus, evidence that the wind was blowing in a certain direction a month ago, or perhaps even only yesterday, ought to be no evidence at all that it is so now, whereas proof that a certain tract of land is hilly and timbered is good evidence that it has always been so, or at least for a very long time. In the instant case there is no showing that the lavatory floor was wet because of some permanent condition such as a leaking pipe or a spouty place in the ground. On the contrary respondent contends that because the floor rested on low ground and was found rotting and wet in the dead of winter, 1926, therefore we are to presume or infer the floor was wet a year and half earlier, in August, 1924, there having been a heavy rain that day. In our judgment this is going too far.

It is further argued the physical fact that water will run down hill, plus the proof of the heavy rainstorm and that the floor rested on low ground, establish circumstantially the floor boards were wet in August, 1924, when taken in connection with the evidence showing

them to be in that condition in January, 1926. But we do not think so. The evidence as to the topography, what the course of the water would be, whether or not it would be diverted by intervening obstacles, the amount of rainfall on and prior to the two occasions, whether the damp condition found in 1926 might have been due to other causes—on all these points the evidence is too inconclusive to make a substantial showing as the record stands.

V. Numerous witnesses for respondent were permitted to testify, over proper objections and exceptions, that long after the date of the accident she told them she had received an electric shock and that it was the cause of her injuries. The following questions and answers were illustrative:

"Q. What I want to know now is what, if anything, did Miss Jessie Conduitt say *caused* her eye to be in that condition? A. She said she had an electric shock and told me she pulled on both lights. She told me just about what she told here on the stand."

Of two other witnesses: "Q. What did she say her condition was as to her eye? A. She said *her condition was due to the shock* and that she could not use her arm and hand."

Of several other witnesses: "Q. What complaint, if any, did Miss Jessie Conduitt make to you about having received a shock at the same time you received a shock, several days after the time you received the shock? A. I met her on the street. I noticed her eye or eyelid was down and I asked the question, 'Jessie, what is the matter with your eye?' At this time I knew nothing about her receiving a shock. She said, 'That is what the *electric shock did to me* the other night.' I was impressed because I didn't know anything like that had happened. *She said the doctor said that was what caused it.*"

It is manifest that respondent's statements were not spontaneous expressions made at the time and place of the alleged shock, or nearly so, and as a part of the *res gestae*, but were narrative statements of past events and self-serving in their nature. Such evidence was wholly incompetent and, as it related to a seriously contested issue, was prejudicial. [22 C. J. sec. 545, p. 454 et seq.; Pryor v. Payne, 304 Mo. 560, 574-9, 263 S. W. 982, 985; Brashear v. Mo. Pac. Ry. Co. (Mo. App.), 6 S. W. (2d) 650.]

VI. Appellant concedes that under the decision in Morrow v. Missouri Gas & Elec. Service Co., supra, 315 Mo. l. c. 390, 286 S. W. l. c. 116, the testimony of other persons as to shocks received by them about the same time from the same lighting circuit was competent. But it is contended that one of these witnesses was improperly permitted to go further and testify as to the extent and severity of the shock she

received, and to state the specific injury she suffered, namely, that she was knocked down by the shock and a menstrual disturbance resulted. The circumstance that the witness was knocked down was concomitant with the shock and as much a part of the *res gestae* as the shock itself. But not so with respect to the physical result that followed after. The fact that the witness's menstrual flow was accelerated was collateral. It gives rise to no inference that respondent's alleged serious injury was due to the same cause. The admission of it may not have been harmful, yet it was incompetent and should have been excluded. [Horr v. Railway Co., 156 Mo. App. 651, 137 S. W. 1010.]

VII. Error is assigned to the admission of certain testimony of one of the electrical experts, Mr. Fox. He was permitted to express the opinion that appellant's system of wiring was not reasonably safe, because the secondary wires were not grounded or neutralized at the transformers. It is contended this invaded the province of the jury. The appellant developed from another expert witness testimony tending to show that the grounding of the secondary wire would not necessarily carry off excess current. The evidence complained of was not improperly admitted. [Busch & Latta Painting Co. v. Woermann Const. Co., 310 Mo. 419, 441, 276 S. W. 614, 620.]

The judgment of the circuit court is reversed and the cause is remanded. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur.