**Bob K. REA, Plaintiff-Respondent,**

v.

**ST. LOUIS–SAN FRANCISCO RAILWAY COMPANY, a Corporation, Defendant-Appellant.**

**No. 51673.**

Supreme Court of Missouri, Division No. 1.

Feb. 13, 1967.

Jo B. Gardner, Monett, for plaintiff-respondent.

E. D. Grinnell, Jr., St. Louis, C. Wallace Walter, Harold F. Glass, Mann, Walter, Burkart, Weathers & Schroff, Springfield, for defendant-appellant.

HENLEY, Judge.

This is an action for damages under the Federal Employers' Liability Act (45 U.S.C.A. sec. 51 et seq.) for personal injuries arising out of a collision of diesel units of defendant's freight train with diesel units of another train in the Cherokee Yards in West Tulsa, Oklahoma. Verdict and judgment were for plaintiff for $40,000. Defendant appeals.

The six points relied on and briefed by defendant may be summarized as errors in the admission in evidence of a mortality table; in giving instruction No. 2; in permitting plaintiff to make certain argument; and, in denying defendant a new trial, because the verdict was excessive.

Plaintiff, age 43, a resident of Tulsa, Oklahoma, was employed by defendant as a locomotive engineer. On February 15, 1963, at about 9:55 P.M., plaintiff, as engineer, with Garrett J. Williams, as fireman, and Melvin H. Owings, as brakeman, left Oklahoma City enroute to Tulsa on train No. 36 consisting of five diesel engines and freight cars. Somewhere between those two cities, possibly at or near Bristow, plaintiff and fireman Williams exchanged positions, and from that point on Williams, as acting engineer, operated the train from the engineer's seat box on the right side of the lead engine until the engines were parked for the night at West Tulsa. After they had exchanged positions, plaintiff occupied the fireman's seat box on the left side of the lead engine.

The train reached West Tulsa early in the morning of February 16, at about 12:40. After entering the Cherokee Yards, brakeman Owings uncoupled the five diesel units from the balance of the train and the diesel units then proceeded forward to clear the first of two switches through which they would have to back up to reach diesel track No. 2 on which they intended to park the units for the night near the roundhouse. After clearing this switch the diesel units were stopped and the brakeman changed the switch to permit the back-up movement onto what is called the roundhouse lead track. The roundhouse lead track, as it approaches the roundhouse from the north, splits at a switch into what is designated as diesel track No. 1 and diesel track No. 2. Diesel track 1 is actually a continuation or extension southward of the roundhouse lead track. At the switch which splits diesel track 1 from diesel track 2, diesel track 2 angles or breaks off to the southwest.

A consist of six diesel units with their brakes locked was parked on diesel track 1 approximately five car lengths, or 225 feet, south of the switch which splits the track

into diesel tracks 1 and 2. Plaintiff and Williams had seen this consist parked in this position with its lights on after train 36 entered the yard and before their five diesel units began the southward back-up movement.

The switch at which the roundhouse lead track splits into diesel tracks 1 and 2 consists in part of a light and a "target"[1] below the light. The color and position of the light and position of the target indicate the alignment of the switch tracks. On this occasion the light was "out" and a portion of the target was "missing."

Backing the five diesel units southwardly through the first switch onto the roundhouse lead track, Williams, as acting engineer, stopped the units with the most southerly unit a few feet north of the second switch. The lead unit in which plaintiff and Williams were riding was the farthest north from this switch.

Brakeman Owings was on the southern end of the five diesel units as they backed up and stopped at the second switch to permit him to "throw" the switch to cause the units to travel onto diesel track 2. He mistakenly or negligently threw the switch so that these units traveled onto diesel track 1 and into collision with the six parked diesel units, as a result of which plaintiff allegedly suffered injuries to his lower back.

Brakeman Owings was called to the stand by plaintiff. He testified, on direct examination, that he looked at the switch and thought it was then aligned to cause his units to continue onto diesel track 1, so he threw the switch to cause his units to travel onto diesel track 2; that he was mistaken about how the track was aligned when he looked, because it was, before he threw the switch, aligned so his units would have traveled onto track 2, and his throwing the switch in fact aligned the track so that his units continued onto track 1. He further testified, on direct examination, that the light on top of the switching mechanism was

out, and that he was not sure whether the target was in place; that he had a lighted switchman's lantern with him; that he could have determined accurately " * * * by the target position or by the light * * *" how the switch was aligned had he " * * * looked a longer period of time at it * * *;" that he was also required to, but did not, look at the switch track points as another test to determine how the track was aligned.

He further testified, on direct examination, that after throwing the switch he stepped back across the track to the engineer's side of the units and gave the back-up signal to acting engineer Williams; that his units then began the back-up movement and picked up speed to approximately five miles per hour before the collision; that he realized he had aligned the switch wrong as soon as he gave this signal and he immediately gave Williams an "emergency stop" or "washout" signal; that his units traveled approximately 200–225 feet before colliding with the six units parked on diesel track 1; that his units continued to back up at the same rate of speed; that he did not hear the brakes applied; that the collision jarred or moved the parked units back approximately eight feet; that acting engineer Williams said after the collision that he did not see the emergency stop signal.

Plaintiff testified that between the stop at the last switch and the collision the diesel engines built up a speed of three to four miles per hour; that at this speed the units could be stopped within 10 or 15 feet.

Defendant contends that the court erred in giving verdict-directing instruction No. 2, because it did not require the jury to find any specific act or acts of negligence causing the collision; that the instruction required a finding of general negligence only. The instruction was marked by plaintiff as "MAI 17.01 (modified)." MAI 17.01 is the verdict-directing instruction required by Civil Rule 70.01, V.A.M.S., to be given where a single negligent act is submitted.

1. A round thin piece of metal, appearing from a photograph to be white in color and approximately six inches in diameter.

We need not set out the instruction in full; it does, as defendant contends, submit general negligence only, and plaintiff has, considering his contention to be mentioned immediately below, at least inaccurately noted its MAI number in violation of Civil Rule 70.01(d).

Plaintiff contends that he did not intend to submit specific acts of negligence; that he pleaded, proved, and submitted on the res ipsa loquitur doctrine. Because of the view we take of the case we need not decide whether the instruction is proper for a res ipsa submission. And, for that matter, defendant does not contend that the instruction is erroneous as a res ipsa submission.

Defendant contends in his reply brief (1) that plaintiff did not make a submissible res ipsa case; (2) that plaintiff, by his own evidence, showed specific acts of negligence which precluded his submitting under the res ipsa loquitur doctrine.

 In Williams v. St. Louis Public Service Co., 363 Mo. 625, 253 S.W.2d 97, 102 [2], the court en banc said: "Submission under the res ipsa loquitur doctrine may not be denied, unless specific negligence, the real or precise cause is definitely shown by direct evidence." However, where specific negligence, the real or precise cause, is shown definitely by direct evidence there is no room for the presumption or inference which the res ipsa rule affords. The plaintiff is bound by his evidence in a res ipsa case just as he is in an ordinary negligence action and cannot in effect say to the jury, "I have shown you exactly how this collision occurred but you are, nevertheless, still at liberty to speculate and presume that it may have happened some other way."

 Reference to the testimony of plaintiff's witness, brakeman Owings, leads to the inescapable conclusion that plaintiff showed specific acts of negligence, the real or precise cause of the collision of the two trains. For this reason, plaintiff could not rely on and was precluded from submitting under the res ipsa loquitur doctrine.

Citing Conduitt v. Trenton Gas & Electric Co., 326 Mo. 133, 31 S.W.2d 21, and Weigand v. Pennsylvania R. R. Co., 3 Cir., 267 F.2d 281, plaintiff says even though he introduced evidence tending to show the cause of the accident, he did not lose the benefit of the res ipsa doctrine, because, by his evidence, the cause is left in doubt and is not clearly shown. The cause of this collision is not left in doubt; it is clearly shown by plaintiff; the cases are not applicable.

 Plaintiff also contends that he was entitled to a directed verdict on the issue of liability, and that error, if any, in the instruction did not materially affect the merits of the action. We note in passing that plaintiff did not move for a directed verdict. Edens v. Myers, Mo., 365 S.W.2d 559. He insists that there was no dispute as to the facts and that counsel for defendant admitted negligence during oral argument. That portion of the argument to which plaintiff refers as an admission is: "Mr. Walter told you in his opening statement, there have been some mistakes and errors made. There is no question about that or else there would not have been this incident". We do not construe this broad, general statement made during argument as a judicial admission of liability or of the truth of plaintiff's proof of negligence. Some of the basic facts are in dispute and, under the circumstances, the credibility of plaintiff and his witnesses and the weight to be given their testimony was for the jury. Venditti v. St. Louis Public Service Co., 360 Mo. 42, 226 S.W.2d 599, 603 [11] and cases there cited. Plaintiff was not entitled to a directed verdict.

Since the case must be reversed and remanded for the reasons above stated, it is not necessary that we discuss defendant's contention that the verdict is excessive; nor do we need discuss alleged errors in ad-

mission of evidence and in permitting certain argument.

The judgment is reversed and the cause remanded for a new trial on all issues.

HOLMAN, P. J., concurs.

SEILER, J., not sitting.