BENJAMIN PHILIBERT, Appellant, v. BENJAMIN ANSEHL COMPANY, a Corporation.—119 S. W. (2d) 797.

Division One, September 17, 1938.*

*NOTE: Opinion filed at May Term, 1938, May 26, 1938; motion for rehearing filed; motion overruled at September Term, September 17, 1938.

*Lashly, Lashly & Miller* for appellant.

*Green, Henry & Green* for respondent.

1244

BRADLEY, C.—Plaintiff, appellant here, obtained a verdict against defendant for $19,833, for personal injuries. Motion for a new trial was sustained and plaintiff appealed. The new trial was granted on the ground that the court erred in refusing a demurrer to the evidence both at the close of plaintiff's case and at the close of the whole case. Defendant contends that granting the new trial was proper for two reasons, viz.: That the petition fails to state a cause of action, and that there was no substantial evidence to make a submissible case.

Plaintiff proceeded under the *res ipsa loquitur* doctrine and on the theory that he was an invitee on the premises of defendant when and where he was injured. The answer was a general denial. An *ore tenus* demurrer to the petition was overruled. The point on the petition is that it does not allege facts sufficient to state a cause of action on the theory that plaintiff was an invitee. On the question, the petition only charges that plaintiff "was lawfully upon the premises of the defendant . . . on the 25th day of April, 1934, and that while there and in the exercise of due care for his own safety a platform . . . suddenly and without warning fell upon" him, resulting in the injuries complained of, and that "the injuries were directly and proximately caused by the negligence and carelessness of the defendant in causing and permitting said platform and boxes of bottles and jars to fall upon the plaintiff." Without more than alleged, defendant says that plaintiff alleged only that he was a licensee, and not an invitee. On an *ore tenus* demurrer a petition will be given the most favorable construction, and plaintiff will have the benefit of every fair inference in support of the petition. And an *ore tenus* demurrer will not reach the defect of pleading conclusions. [State ex inf. Major v. Ark. Lumber Co., 260 Mo. 212, l. c. 283, 169 S. W. 145; Colliseum Athletic Assn. v. Dillon et al., 204 Mo. App. 504, 223 S. W. 955; Doyle v. Scott's Cleaning Co., 224 Mo. App.

1168, 31 S. W. (2d) 242.] As appears from the above quoted portion of the petition, plaintiff alleged that he was "lawfully upon the premises," and that his injury was caused "by the negligence and carelessness" of the defendant.

If a defect in a petition is such that it would be cured by verdict, then an *ore tenus* demurrer will not lie. [Marshall v. Ferguson, 78 Mo. App. 645; W. T. Rawleigh Co. v. Grigg (Mo. App.), 191 S. W. 1019.] Also it has been held that an assignment, based on the overruling of an *ore tenus* demurrer to the petition, will not be sustained on appeal where defendant did not stand on the demurrer. [Bremer v. Simpson (Mo.), 226 S. W. 947.] [2] Defendant's situation, so far as concerns the petition, is the same, as if there had been an answer over after a written demurrer had been overruled. Certainly the situation can be no better. Under the evidence, which went in without objection, so far as concerns the petition, it clearly appears that plaintiff was an invitee, and in such situation (absent objection) the petition will be treated as amended to conform to the facts in evidence. [Ilgenfritz v. Mo. Power & Light Co., 340 Mo. 648, 101 S. W. (2d) 723, l. c. 726, and cases there cited.]

Plaintiff makes the point that defendant was in no position to challenge the sufficiency of the evidence because after its demurrer to the evidence at the close of the whole case was refused, it requested and was given instructions on the issues involved. There is no merit in this contention. [Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600; Grimes v. Red Line Service, Inc., 337 Mo. 743, 85 S. W. (2d) 767; Hughes v. Kiel (Mo. App.), 100 S. W. (2d) 48; Ambruster v. Levitt Realty Co., 341 Mo. 364, 107 S. W. (2d) 74.]

Did plaintiff make a submissible case? Plaintiff was in the employ of the Southwestern Bell Telephone Company in St. Louis, and defendant was engaged in St. Louis, in the manufacture of cosmetics, and was, at the time, moving from 6700 Vernon Avenue to 6000 Goodfellow Avenue. It was necessary to move the private telephone exchange of defendant from the old to the new location, and plaintiff, as the employee of the telephone company, was sent to install the exchange, called a PBX (private branch exchange). As we understand, defendant's factory building faced north and extended south between 300 and 400 feet. The office was in the front part of the building. Then next south was what is called a hallway. Immediately south of the hallway was the factory portion and then the shipping room. However, what was called the factory and the shipping room was one large room (no partition), but we designate the portions as the factory room and the shipping room.

The arrangement for the installation of the exchange were made by defendant and Mr. Costello of the telephone company. Costello and plaintiff went to defendant's plant and ascertained where the switchboard was to be placed and where the connected stations would

be. At the place on the floor of the office where the switchboard was to be placed, there were some iron pipes extending up through the concrete floor, and Costello suggested to Mr. Guittar, a carpenter and defendant's employee, that these pipes be cut off some, and that a small box be made to place over them. Costello testified that the cutting of the pipes and making the box were not things to be done by the telephone company. After it was ascertained where the switchboard was to be placed and where the connected stations were to be, plaintiff and helper commenced the installation. The pipes had been cut off by defendant and a box to go over the pipes had been made by Guittar. About eleven A.M., the day plaintiff was injured, he was ready to use the box, but the one made by Guittar was too small, and he, plaintiff, took it to Guittar, and, according to plaintiff, he told Guittar that he had to have a larger box, and that Guittar said that he "would build another box." Plaintiff then went to lunch, and returned about one P. M., and looked for the larger box, but it was not there. He testified that he then picked up "the cable terminal that was supposed to go in this box" and went back into the factory room to see Guittar about the larger box. He found Guittar at his (Guittar's) work bench in the southeast corner (had there been a partition) of the factory room. On the east wall of the factory room, and near the division line between the factory and shipping room, was an overhead platform or shelf upon which there were about 400 cartons of empty jars, the weight of each carton being about 8 pounds. Guittar said that his work bench "was under this platform or slightly to the side of it." After arriving at the place where Guittar was, plaintiff testified that he "went up to him and asked him if he had the box, but he said no, he hadn't done anything on it yet, so I told him I had to have it because my work had gone as far as I could go without the box and I started to show him the cable terminal, and at that time some one hollered, 'Look out,' and from then on of course this shelf fell, and I don't remember now exactely what took place." Plaintiff testified that he had no warning of any kind.

Defendant says that, conceding that plaintiff was an invitee, he still cannot recover, because he was, when injured, at a place "to which he was not actually or impliedly invited," and that under no theory can plaintiff recover, because the telephone company (by Costello) in requesting Guittar "to build the box," made Guittar the agent of the telephone company for the purpose, and that defendant is not responsible.

The place where plaintiff was injured was 200 feet or more from the place where the exchange was to be installed. And since defendant was moving into the new location, things were quite in confusion in the rear portion of the building. It finally turned out, after plaintiff was injured, that the plan of installing the switchboard was changed and a box was not placed over the extending pipes. But

Costello, who was plaintiff's superior with the telephone company, testified that the box was necessary, hence so far as plaintiff was concerned, having no other instructions, he had the right to proceed on the theory that the box was necessary. Defendant argues that Guittar had no authority, unless directed by a superior, to make the box, but so far as concerns the demurrer to the evidence (Costello having testified that it was not the duty of the telephone company to make the box), it was defendant's duty to *provide* the box. It being defendant's duty (so far as concerns the demurrer) to make the box, it is immaterial, we think, as to whether Guittar had direction from a superior before he started making it.

 It is further contended by defendant that the place where plaintiff was injured was a place where he was not invited. In the brief defendant says that if plaintiff was injured at a place where he was not invited to be "it is wholly immaterial whether the work he was doing was of benefit to the invitor, because he must perform his work within the sphere of the place to which he is invited." As supporting this contention defendant cites Menteer v. Scalzo Fruit Co., 240 Mo. 177, 144 S. W. 833, and Barry v. Calvary Cemetery Assn., 106 Mo. App. 358, 80 S. W. 709, and a number of cases from other jurisdictions. There can be no argument on the correctness of the proposition that an invitee cannot recover when injury occurs at a place on the premises where he has no express or implied right to be. An invitee to the premises of another has the right to go to "all portions of the premises which are included within the invitation and it is necessary or convenient for the invitee to visit or use in the course of the business for which the invitation was extended, and at which his presence should therefore reasonably be anticipated." [45 C. J., sec. 240, p. 830; Watson v. The St. Joseph Coal Mining Co., 331 Mo. 475, 53 S. W. (2d) 895; Glaser v. Rothschild, 221 Mo. 180, 120 S. W. 1, 22 L. R. A. (N. S.) 1045, 17 Ann. Cas. 576.]

In the Watson case, supra, plaintiff had been told "to come down" to the mine and he would be put to work. The situation at the mine is described as follows: "Defendant's mine was located on the Santa Fe Railroad, one-half mile south of Vibbard Station. The main line track ran past the mine from northwest to southeast. From just north of the mine a switch track went due south, along the east side of the mine, within 10 to 15 feet of the shaft tower, which was a structure built over the mine shaft. The entrance to the shaft, used by the miners to go into the mine, was on the west side of this building. There were gates in front of this entrance, and above it was a sign which read: 'Danger, Keep Away From Here.' On the south side of the shaft tower were steps which led up to the weighmaster's office, about 10 feet above the ground. Cars of coal were brought up the shaft, in an elevator or cage, and were there weighed. They were then run out on a track, above the railroad switch, dumped into

railroad cars, taken back into the shaft tower, and returned to the mine. Above this elevated coal car track was another track, 25 or 30 feet high, which ran out of the east side of the shaft tower, across the railroad switch, onto a dump located between the railroad switch and the main line track. Cars of rock, from the mine, were elevated to the level of this track and run out on it, above the railroad switch, and dumped between the two tracks. West from the north side of the shaft tower, there was an engine house, in which were located the engines operating the machinery in the shaft tower. South of the shaft tower, there was a washhouse, which the miners used when they came out of the mine.''

The plaintiff had not, prior to his injury, been at the mine. He walked from Vibbard down the railroad track until he arrived at the switch track. There he followed a path southwest between the shaft tower and the engine house. He saw no one on the west side of the shaft tower, and went on around to the south side where he found steps leading to the weighmaster's office. He went up the steps to the office and asked where the foreman was, and was told he was down in the mine. He then went back down the steps and around on the east side of the shaft to a railroad car where a man was breaking coal, and got up on the end of the car and asked where the foreman was, and was told again that he was down in the mine. While standing on the end of the railroad car, a mine car loaded with rock was run out of the shaft and onto and over the overhead track and a large rock fell from this mine car and struck and injured plaintiff. It was held that ''the question of whether plaintiff was within the bounds of his invitation, in going to this railroad car, was for the jury.''

As stated, plaintiff, in the present case, returned from lunch about one P. M., to continue the work of installing the switchboard, and found that the box was not there. Did he depart from the scope of his invitation by going to see about the box? His duty to defendant was to install the exchange, and, as stated, for the purpose of ruling the demurrer to the evidence, it was the duty of defendant to furnish the box. Guittar, according to plaintiff, had told him that he (Guittar) would make another box.

In Blood v. Ansley, 231 Mass. 438, 121 N. E. 488, Blood was invited to defendant's foundary to examine a casting. The foundry building was 30 x 90 feet. The pattern room and the office room were in front. To the rear of these was the moulding room, extending back 50 feet, and to the rear of the moulding room was the tumbling room. On the east side of the tumbling room was a door. South of this door and between the door and the south wall was ''a spring of water enclosed in a concrete barrel about four feet in diameter.'' When Blood arrived at the foundry the casting was in the tumbling room, but was taken to the moulding room. There was not suf-

ficient light in the moulding room to make the examination, and Blood, with defendant's employee carrying the casting, went to the tumbling room for better light, and there he stepped into the concrete barrel. It was held that the question as to whether or not Blood went beyond the scope of the invitation was for the jury. [See, also, Coffer v. Bradshaw, 46 Ga. App. 143, 167 S. W. 119; Williamson v. Neitzel, 45 Idaho, 39, 260 Pac. 689; Ellington v. Ricks, 179 N. C. 686, 102 S. E. 510.]

It is true that plaintiff might have made inquiry about the box, or he might have sat down and waited for Guittar to bring the box. But had he done the latter he would have waited in vain, because, according to defendant's evidence, Guittar had been instructed since plaintiff had gone to lunch, as we infer, not to make the box. And as we understand, this instruction was given to Guittar on the theory that it was not defendant's duty to make the box. But plaintiff had no knowledge of such instruction.

It is our conclusion that the question of whether plaintiff exceeded the scope of his invitation by going to the factory room to see about the box was one for the jury.

■ Defendant in its motion for a new trial also assigned error on the admission of evidence; on plaintiff's Instruction No. 1; and on an excessive verdict. The trial court did not specify either of these grounds as a reason for granting the new trial. In such situation the burden is on defendant to show that these grounds or one of them, was sufficient to support the order granting the new trial. [Yuronis v. Wells, 322 Mo. 1039, 17 S. W. (2d) 518.]

■ Defendant contends that the court erred "in permitting plaintiff's witnesses to testify to acts and statements of Guittar." We, in effect, disposed of this complaint, supra, in holding that if it was defendant's duty to make the box, it was immaterial who of its employees did the work.

■ Plaintiff's Instruction No. 2 defined the term invitee. Instruction No. 1 is as follows: "The jury are instructed that if you find and believe from the evidence that the plaintiff, while upon the premises of defendant and at the place where he was injured, if you so find, as an invitee, as that term is defined in other instructions herein, on or about the 25th day of April, 1934, was struck by boxes containing jars and bottles falling from a platform then and there being maintained by defendant immediately above the place where plaintiff was standing, and plaintiff was thereby injured; and you further find that said platform and boxes of jars and bottles were in the exclusive possession and control of defendant and that plaintiff does (did) not know, and has (had) no way of determining the causes of said platform and the boxes of jars and bottles thereon falling upon plaintiff, then you are instructed that such facts, if you believe them to be true, are sufficient evidence of facts and circum-

stances to warrant a finding by you that the defendant was negligent and you may so find, unless you find and believe from other facts and circumstances in evidence that the occurrence was not due to the defendant's negligence; and if you do find and believe from all the evidence in the case that the defendant was negligent and that the plaintiff's injuries, if any, were directly caused by the defendant's negligence, then your verdict should be for the plaintiff.''

It is contended that Instruction No. 1 was erroneous (1) because ''it excluded certain facts and circumstances from the consideration of the jury in determining whether or not defendant was free from negligence;'' (2) because ''it told the jury that defendant's negligence was a fact, not that there was merely a presumption of negligence;'' (3) because ''it commented on the evidence and invaded the province of the jury;'' and (4) because ''it limits the jury in considering whether defendant was not negligent to 'other facts and circumstances' and thereby excludes from their consideration, as far as the defense is concerned, the facts and circumstances hypothesized in plaintiff's instruction.''

When defendant's witness Guittar was on the stand the defects of the platform were disclosed, but this did not require plaintiff to submit his case on specific negligence. It would have been otherwise, had plaintiff's evidence disclosed the defects. [Conduitt v. Trenton Gas & Elec. Co., 326 Mo. 133, 31 S. W. (2d) 21; Bond v. St. Louis-S. F. Ry. Co., 315 Mo. 987, 288 S. W. 777; Watts v. Mousette, 337 Mo. 533, 85 S. W. (2d) 487, l. c. 492.] There is no merit to the first, second, and third complaints on Instruction No. 1. The fourth complaint is ably ruled in Thompson v. Kansas City Public Service Co. (Mo. App.), 114 S. W. (2d) 145, in which certiorari was denied April 21, 1938.

Was the verdict excessive? At the time of injury plaintiff's age was fifty-two, and his pay from the telephone company $8.40 per day. About the time of the injury the telephone company raised wages, and plaintiff's name ''happened to be on that raise sheet,'' at $8.60 per day, and as we understand, his pay was never stopped. He was in the hospital nine weeks, and was in bed at home about a week. He went back to work for the telephone company in about five months after he was injured and worked ''steady ever since,'' but did installing work in the telephone company building. He was not able, after injury, to do the heavy work of installing. ''When they get a big job they always send in help and all I do is help hook the instruments up and do the light work. When there is cable to pull I don't do it. When there is a desk to be moved I get the janitor.'' The trial was one year and eight months after injury. Plaintiff testified that he was injured in the back, shoulders and head; that something hit him ''on the back and made a letter J;'' that the ''flesh was cut open from the top of the right shoulder clear down past

his second vertebra, and it stopped over on one side, the left side;'' that he was ''in pain more or less since I left my bed. Sometimes the pains are more and then again as the weather gets nice and warm and good and hot, it diminishes, but I have always got a pain across the small of the back, and a pull, I got a pull in my groin, and of course, this leg here (indicating). That right leg has a woody feeling, just like a piece of wood instead of flesh. I can touch this leg and feel it, but I can touch this one and it feels like there is something inside there that shouldn't be. The feeling is not as active as in the other leg.''

Dr. Robert E. Wilson who saw plaintiff immediately after injury and who treated him, testified that at first plaintiff was semiconscious; that he had numerous cuts and bruises over his body; one on the head, and numerous cuts on the entire back, on the left leg and shoulder; that he had a partial paralysis of both legs, more marked on the right; a partial loss of sensation in both legs and more marked on the right; that there were seven fractures of the spine, and three ribs fractured; that the principal fracture causing the paralysis was a fracture ''down in the lower part of the back, known as the lumbar vertebrae;'' that the second one of these (lumbar vertebrae) was ''jammed in and buckled.'' ''He had a fracture and separation of the second and fifth lumbar vertebrae,'' and a kyphosis (humpbacked) condition of the spine in the lumbar region appeared from the X-rays. The sacrum was also fractured. ''The transverse processes of the second and third vertebrae were both broken and fractured on both sides. . . . These injuries are necessarily accompanied by pain, very severe.'' Dr. Wilson treated plaintiff for about a year and a half; said that he was incapacitated for some five or six months. Dr. Wilson was asked if plaintiff would ever recover, and answered, No. Then the record shows the following: ''I saw him walking around here today. To some extent he has recovered the use of his limbs; it is not perceptible in walking. Q. In what way does the injury manifest itself to you as a physician at this time? A. This man is unable to bend forward or backward or sideways due to these injuries, and he is also unable to have the locomotion that we normally have in the way of moving fast. He also has considerable disturbance there if he gets in certain positions, bending and holding one position a certain length of time. He is not capable of doing any manual labor at this time. I know the position that he now holds at the Bell Telephone Company. I don't know how much he is doing at this time. I wouldn't say the man was capable of doing very much heavy work. Q. Is that condition necessarily permanent in the nature of his injury? A. Yes. As to the manual labor, as a manual laborer, I don't think this man would be worth very much. Q. What is your opinion as to the pain that he might suffer in the future as a result of these injuries? A. I think the

man will always have about the same injury and the same condition he has got now. He is always going to have pain when he attempts to use the body in bending forwards, backwards, sideways or lifting or doing any manual work.''

Dr. Joseph C. Pedden, a witness for defendant, took X-ray pictures of plaintiff on April 25, 1934, date of injury, and on May 10, 1935. Dr. Pedden testified that plaintiff had a fracture of the second and fifth lumbar vertebrae, and ''a little crack in the right side of the sacrum. And then he had a fracture of the first left transverse process here, and both transverse processes of the third lumbar, and the right transverse process of the fourth lumbar;'' that he thought the second lumbar fracture had ''healed in good alignment. . . . Q. Do you notice anything in the film with reference to the second lumbar vertebra that would indicate any trouble at this time? A. He has a tendency toward a union between the first and second; there is a tendency for those to grow together where they normally should have a space between them. That is an attempt at healing to fix it so it can't move. It will just mean he can't move his back at that part. The movement in his back will be above and below that. I don't know whether he has any pain or not; that is problematical. Because of the pathology that I discovered in that first lumbar, I think he had some pain for awhile afterwards; I don't know whether he has any pain now or not, but I do know that he had some pain for a length of time afterwards. Q. From now on, do you expect to find any pain? A. I think that would be awfully hard to say, whether I expect to find it or not, because I didn't examine him physically and I don't know. The next fracture I discovered was of the left transverse process of the first lumbar vertebra; that is healed back in good position. Q. Are there any findings that you have there now that would disturb him as a result of that healing? A. I don't think so; not as far as that is concerned. Q. What is the next one? A. The two transverse processes of the second have healed back in good position. Q. Do you find anything as a result of that healing that might cause him trouble now? A. No, sir. Q. What is the next one? A. The right transverse process of the third lumbar is healed back in good position. Q. Anything in that to distrub him? A. No. Q. What is the next one? A. The left transverse process of the third; there is a separation between the ends of the bones, there is a little gap in between them, a little more than a quarter of an inch. My personal belief as to the effect of this gap is, as to the transverse process, whether the bone has healed exactly or not; if the muscles and tendons heal, he won't have any trouble. I don't know whether the muscles and tendons have healed or not, except that they should have healed at this time. I didn't make that type of an examination. He had a fracture of the left transverse process of the fourth lumbar; it still shows a little gap of

those fragments; it is about the same as the other one. The sacrum down there is healed. I notice a fracture in the sacrum in the first picture. That is healed now and the alignment is perfect. . . . Q. Now that next film that you have there, is there any value to us in that? A. No. It just shows the healing process in the second lumbar and the fifth. It was taken the 10th of May, 1935. This is the second lumbar. In the original film this vertebra was crushed and it showed some wedging, but at the present time that has been overcome, so that this vertebra is practically the same size as the normal one above and below it."

Dr. W. J. Gallagher, a witness for defendant, examined plaintiff "from head to foot" on May 10, 1935, and testified that plaintiff was well nourished; that his weight was 147 pounds; that his walking and standing were normal; did not appear nervous; that his breathing and lungs were normal; that the spinous processes all appeared "to be in normal alignment. . . . I put him through all the movements, bending backwards, forwards and sideways, and all of these movements were full; he could bend as far as I thought was normal, but he did them very slowly and apparently under some strain. He stated that he had a pull, I believe sort of a pull, down in the lower back and some pain over the sacrum. The muscles over the back, that run alongside of the back are not rigid at all. A test we often use is laying them on their back and having them lift their legs. He was able to lift one leg, first on one side and then on the other without complaining of any pain at all, but when he was lifting them up together, he stated that he had some pain in his back. Testing the reflexes by striking them with the rubber hammer, both on his arms, legs and the rest of his body, nothing abnormal with the nerves and he had good feeling all through his body. The examination of his arms didn't show a thing, and the legs, there was a scar down in the left ankle region. Otherwise, these parts were negative."

The character of injuries here is such as remarked on in Hoelzel v. Chicago, R. I. & P. Ry. Co., 337 Mo. 61, 85 S. W. (2d) 126, l. c. 133, as follows: "The character of plaintiff's injuries was such that lay jurors could not determine their extent by observation, such as they would be able to do, in a large measure, in case of the loss of a leg or the loss of an eye, and other like cases. Judges are somewhat in the position of lay jurors in this regard. In such cases courts should not be quick to disturb the verdict of a jury where it is supported by substantial evidence, the weight and credibility of which is for the jury, unless the amount of the verdict is manifestly out of proportion to the injuries proven."

But "when the facts as to the injuries inflicted and losses sustained are similar (to other cases), though never identical, there should be a reasonable uniformity as to the amount of verdicts and judgments

in the various cases." [O'Brien v. Rindskopf, 334 Mo. 1023, 70 S. W. (2d) 1085, l. c. 1093.]

In Lynch v. Baldwin et al. (Mo.), 117 S. W. (2d) 273, not yet reported, the injuries were similar to those in the present case, though not so extensive. But in that case the earnings of the plaintiff were not so great as the earnings of plaintiff in the present case. In the Lynch case we required a *remittitur* reducing the verdict from $15,-000 to $12,000. We think that if reasonable uniformity in the amount of verdicts is to be retained, the present verdict should be reduced to $16,000.

If plaintiff will, within ten days from the filing of this opinion, file here a *remittitur* of $3833, the order and judgment granting the new trial will be reversed and cause remanded with direction to set aside the order granting a new trial, reinstate the verdict, reduce the same to $16,000, and enter judgment thereon for the plaintiff for $16,000, to draw interest from date of entry of new judgment. Otherwise, the cause will be remanded for a new trial because of excessive verdict. It is so ordered. *Ferguson* and *Hyde, CC.*, concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.