CURTIS PALMER, by Next Friend, ROBERT HOOPS, Respondent, v. A. F. BROOKS, d. b. a. EAST SIDE ICE & FUEL COMPANY, and JAMES BROOKS, Appellants.—No. 38321.—169 S. W. (2d) 906.

Division One, March 2, 1943.

Rehearing Denied, April 6, 1943.

1056

*Kelsey Norman* and *Henry Warten* for appellants.

*Roy Coyne* and *Emerson Foulke* for respondent.

BRADLEY, C.—Action for personal injury. The cause was tried by the court without a jury and judgment went in favor of plaintiff for $8,000. Motion for a new trial was overruled and defendant appealed.

Defendant A. F. Brooks is a coal and wood dealer in Joplin, Missouri, and defendant James Brooks is his son. Plaintiff is a colored boy and was 16 years old at time of injury which was caused by the overturning of a truck upon which he was riding. The truck was owned by defendant A. F. Brooks and driven at the time (September 3, 1941) by his son, James. The truck was a 1½ ton Chevrolet, and was loaded with slab wood, and was traveling north on a gravel road, highway H in Newton County, Missouri, about one-half mile south of the town of Aroma. Defendants and Blackburn Stout were riding in the cab. Plaintiff and Raymond Hayes, who was killed in the turnover, were riding on top of the slab wood.

The negligence alleged is as follows: That defendants "so negligently and carelessly drove and operated the said motor truck that the same was caused to overturn and the plaintiff, who was at all the times herein mentioned exercising ordinary care for his own safety, was thereby caused to be thrown therefrom with great force and violence, and was severely and permanently injured; that the said injuries sustained by plaintiff were caused solely by the negligence and carelessness of the defendants in the following respects, to wit:

"That the defendants were in sole and exclusive control, management and operation of the said motor truck on which plaintiff was then and there riding along highway H, as aforesaid, and that the overturning of the said motor truck and the injuries sustained by the plaintiff were such unusual occurrences that same could not have happened except for the negligence of said defendants."

Defendants answered jointly by general denial, "except the allegations that at the time of the accident the said automobile truck was

being driven and operated by the said James Brooks in the scope of his employment and on the business of the defendant, A. F. Brooks.''

Defendants (appellants) make two assignments, viz.: (1) That there was no substantial evidence that defendants were negligent; and (2) that the damages assessed by the trial court are excessive. Plaintiff contends that this is ''a clear case for the application of the res ipsa loquitur rule'' and that the judgment for $8000 is not excessive.

Some facts were stipulated and by agreement excerpts from the depositions of defendants and Stout, taken in a cause in the federal district court, were read in evidence. These excerpts constitute the evidence as to what occurred, and this evidence follows:

A. F. Brooks testified that he had an accident on highway H, a reasonably level gravel road, about 18 feet in width; that shallow ditches were on either side; that the truck, driven by his son, was traveling north between 30 and 35 miles per hour, and that such was the speed since they ''left the timber''; that as they ''approached'' near the place where ''the accident happened'', he saw an object, ''lying near the center of the road, a little bit to the left of the center'', a little while before they got to it; that he thought it was a piece of paper; that there was also a hay wagon on the right hand side of the road, going north, in front of them; that his son pulled to the left to pass the hay wagon; that about 40 or 50 feet before they got to the object he saw that it was a piece of iron. ''Q. You think you saw what it was as soon as you could? A. Well, yes. It was laying in that loose gravel, and it was real hard to detect what it was. Q. You have the object, haven't you, yet? A. Yes. Q. Describe its size and appearance. A. Well, it was about 10 inches across, and it was about 4 inches high, or 5, somewhere along about there. It was the top of a hot blast stove, is what it was. Q. What happened now after that point when you saw and realized that this was an iron object on the road? A. Well, it was done so quick, you couldn't hardly describe it. When we hit that object, of course it—my judgment is that it blew the tire causing us to list to the left side of the road. Q. The truck did hit the object? A. Yes. Q. Do you know what part of—which wheel on the truck struck the object? A. Well, no, I don't. I did think I knew, but I—it was just so quick and the tire that I thought hit it and blew out, after I got the true facts of the business, wasn't the tire that blowed out; so I would say that I don't know just what happened, and there is a possible chance that the left front wheel hit the object. I mean the right front wheel, throwing the object to the left rear wheel. I don't know what the situation was there.''

A. F. Brooks further testified that everything was all right until the object was struck; that the object was struck when the truck was ''just about even'' with the hay wagon. ''Q. And then you hit the

object, and you felt a list to the left, and then what happened? A. Well, we were—it throwed us into the ditch on the left side of the road, and he cut it to the right, and we got out, and he—of course, that put it crosswise of the road and he—before he could get it straightened up he was too far to the east side of the road, and it caught the gravel and rocks that was along there and held the front end and then the—it commenced, we commenced to rock. Of course, you know when they come out of the ditch on the left side, naturally we were in a kind of a motion, and the truck pulled over on the right side, and then when it caught that gravel it turned to the left side and just went into the ditch and turned the truck—in other words, the truck started to cross the road approximately, say this was square (indicating) at approximately that angle, and then when the front wheels caught that gravel, the force of that started it to turning that way, and it turned over and skidded around and stopped in that position in the ditch on the east side of the road. Q. It stopped on the left side; is that right? Did it overturn on the left side where it came to rest? A. Yes."

A. F. further said that there was a row of gravel on the east side of the road left by a grader and that when the wheels of the truck struck the row of gravel "it seemed to flip the truck over on the other side"; that he supposed *"it was the force that it was going that gave it the momentum to turn over"* (italics ours).

James Brooks testified that he was driving; that as he came over the hill he noticed a wagon, "three quarters of the way down the hill", traveling north; that he imagined the wagon was "a forth of a mile" from him when he topped the hill. "I honked the horn when we went on the hill, and we went on down, and I noticed this object in the road, and I don't know whether we hit it, I believe, and then the left hind dual wheel went into the ditch—about 8 inches down on the side of the ditch on the left side of the road"; that "he pulled out of that ditch all right and went across the road and hit" the row of gravel on the east side of the road; that when he "whipped out of the left hand side ditch", he "whipped into" the row of gravel on the east side and "just turned over"; that "everything happened so quickly nobody knows what happened"; that he was 50 yards north of the hay wagon when he turned over. "I think I hit this object in the road, cast iron, which *either blew the tire then or blew the tire when I got in the ditch.* I was leaving room for the wagon, and *I guess I left too much or something, I don't know"* (italics ours).

James further testified that the object was near the middle of the road, "or a little bit to the left side of the middle"; that he struck the object when he was about 10 feet south of the wagon; that he was "right on" the object before he realized it was a piece of metal; that the object was "just kind of brown" and that he "didn't really think it was anything that amounted to anything

until we got right on top of it; my father cautioned me about it. Q. And what did you do? A. Well, there isn't much you could do right at that time. I pulled over just a little bit, I believe.''

The record is not clear as to which tire blew out. Defendants, in the statement, say that ''Mr. Brooks (A. F.) testified that at the time of the accident he thought one of the truck wheels, in striking this object, had blown out, thus upsetting the truck. However, upon making an investigation after the accident, he discovered that the tire he thought had blown out, had not blown out, and, accordingly, he was unable to say just what happened.'' And defendants further say in the brief, that James Brooks ''testified that he believed his truck hit the iron object, described by his father, before he had passed the wagon; that when struck, it either caused the tire on the inside right dual wheel to blow out then, or to blow out when he got in the ditch on the left side of the road.''

Blackburn Stout testified: ''Q. Tell me how the accident happened. A. Well, how it happened—we—there was a wagon, a fellow driving a wagon along, and it had a horse behind the wagon he (James) was driving, and we went to pass it. And just before he got to the wagon, why, the truck hit something. I was looking at the dog. I didn't see anything in the road. But I heard it hit something. But I thought, the boys (plaintiff and Raymond Hayes) was always banging on the cab, and I thought they had hit the cab or something, and I noticed the truck kind of went to weaving, and he went to go around the wagon, and *he got over a little too far* (italics ours) and the back end of the truck slipped in the left ditch. Well, he got out of that. Q. Got back on the road again? A. Got back on the road again. But on the other side there was a great row of rocks where they had graded it out and made a ditch. Q. A kind of windrow? A. Yes, a windrow right along. And he hit that with his front end and got that out, and when the back end hit it, it bounced over that rock and turned sideways and turned over.''

 In cases which might otherwise be submitted under the res ipsa rule, if the plaintiff's evidence discloses the particular negligence giving rise to the cause, then the cause cannot be submitted under the rule. Philibert v. Benjamin Ansehl Co., 342 Mo. 1239, 119 S. W. (2d) 797, l. c. 802; Conduitt v. Trenton Gas & Elec. Co., 326 Mo. 133, 31 S. W. (2d) 21; Watts v. Moussette, 337 Mo. 533, 85 S. W. (2d) 487, l. c. 492. And in cases where the res ipsa rule is not applicable and general negligence only is pleaded, such is sufficient, absent a motion to make more definite and certain. Zichler v. St. Louis Public Service Co., 332 Mo. 902, 59 S. W. (2d) 654.

''The principal difference between a res ipsa loquitur case and a specific negligence case would seem to be that the very basis of liability, the existence of some negligence, may be shown by a particular kind of circumstantial evidence, namely, an unusual occur-

rence of a character which ordinarily results only from negligence (both in pleading and proof), and from which, therefore, negligence is a reasonable inference; while in a specific negligence case the careless acts or omissions which constitute negligence must be stated and proven. In other words, in a res ipsa case the ultimate fact, some kind of negligence, is inferred without any evidential facts except the unusual occurrence itself; while in a specific negligence case there must be evidential facts sufficient to show some negligent acts or omissions which were the proximate cause of the occurrence." Harke v. Haase, 335 Mo. 1104, 75 S. W. (2d) 1001, l. c. 1004; Gibbs v. General Motors Corporation et al., 350 Mo. 431, 166 S. W. (2d) 575, l. c. 579.

"In general and on principle the doctrine res ipsa loquitur does not apply except when (a) the occurrence resulting in injury was such as does not ordinarily happen if those in charge use due care; (b) the instrumentalities involved were under the management and control of the defendant; (c) and the defendant possesses superior knowledge or means of information as to the cause of the occurrence." McCloskey v. Koplar et al., 329 Mo. 527, 46 S. W. (2d) 557, l. c. 559.

"Where the instrumentality which causes an injury is within the control of, and operated by, a party, and moves or operates in such a way that such motion or operation would not have happened except for some defect or negligent act, and injury to some person results, then the doctrine of res ipsa loquitur applies, and a plaintiff suing for an injury so caused has only to show control of the instrumentality by the defendant and its usual (unusual) movements. It is then for the defendant to explain if it can the casualty so as to exclude negligence on its part." Mayne v. Kansas City Rys. Co., 287 Mo. 235, 229 S. W. 386, l. c. 390; Evans v. Mo. Pac. Ry. Co., 342 Mo. 420, 116 S. W. (2d) 8, l. c. 9. See also, 5 Wigmore On Evidence (2d Ed.), Sec. 2509, p. 598; L. R. A. 1917E, p. 7, note; 45 C. J., Secs. 768-781, pp. 1193-1214; 38 Am. Jur., p. 992, Sec. 296.

As supporting the contention that the res ipsa rule is applicable, plaintiff cites: McCloskey v. Koplar et al.; Harke v. Haase; Evans v. Mo. Pac. R. Co., supra; Tabler v. Perry, 337 Mo. 154, 85 S. W. (2d) 471; Adams v. Le Bow (Mo. App.), 160 S. W. (2d) 826; Vesper v. Ashton, 233 Mo. App. 204, 118 S. W. (2d) 84. No declarations were asked or given and the court made no finding of facts. The finding was merely for plaintiff. It is stated in plaintiff's brief that the res ipsa loquitur rule "was pleaded in the petition", and "tried on that theory in the lower court." However, there is nothing to show whether the trial court was of the opinion that the res ipsa rule was applicable and found for plaintiff on that theory, or whether he was of the opinion that plaintiff's evidence disclosed specific negligence and found for plaintiff on that theory. Plaintiff, as stated, contends that the res ipsa rule is applicable, but even

though such be true, if plaintiff's evidence disclosed the specific negligence that caused plaintiff's injury, then the presumption would be that the trial court found for plaintiff on the specific negligence disclosed, and this because even in a res ipsa case, as appears, supra, if the plaintiff's evidence disclose the specific negligence causing the injury, then the cause cannot be submitted under the res ipsa rule.

The evidence of James Brooks tends to show that he was driving down, at least, a slight grade, and at 30 or 35 miles per hour. The truck was loaded with 5 men and a load of slab wood; the amount of wood and weight of load does not appear. It would be a mere guess to say that striking the stove lid caused the blow out. James said that he didn't know whether the blow out was caused by striking the stove lid or by getting in the ditch. Also, it is quite plain from the evidence of James and Stout that going into the left ditch could have been caused by pulling too far to the left in passing the wagon. Also, the whipping back and forth for a distance of 50 yards after striking the stove lid and after passing the wagon, and before the turnover, would suggest *speed* that might not have been commensurate with the highest degree of care in the circumstances— the slight grade and the weight of the load. And in this connection, it will be noted that A. F. Brooks said that he supposed "it was the force that it (the truck) was going that gave it the momentum to turn over."

The excerpts from the depositions were read by agreement and constituted the evidence by *both* sides as to what occurred, and was *plaintiff's* evidence. In the situation, we think that plaintiff's evidence tended to show specific negligence upon which the court could have based the finding in plaintiff's favor, and such being so, it will not be necessary to determine whether the res ipsa rule is applicable.

Is the verdict excessive? Plaintiff testified that sometimes he had pain under the right knee; that his left foot bothered him when his shoe string was tight; that some mornings he had headache and was dizzy; that he was bothered with his head, but didn't know till the day of trial that he had "a cracked skull"; that when he read his eyes watered; that such was not the case before his injury, and that he did not have headache before the injury; that after the injury he had to quit school because his eyes watered so; that he couldn't study his books and read them; that he was working at the bowling alley and quit because his head and back hurt "practically all the time"; that in school he made E's, S's and M's.

Drs. J. G. McDonald, H. D. McGaughey, J. Albert Chenoweth, J. R. Kuhn, Jr., and B. E. DeTar testified. Drs. McGaughey and Chenoweth were witnesses for plaintiff and the others for defendants.

Dr. McDonald, for defendants, testified that plaintiff was brought to his hospital in Neosho, September 3, 1941; that when he first saw

plaintiff "he was pretty much of a mess to look at"; that he "had lacerations and contusions all over his forehead and one in the back of his head and one on the right side of his neck, and one on his chest, and innumerable ones .on both legs"; that plaintiff remained in the hospital two days and "complained of some headache"; that he perhaps had suffered a concussion of the brain, but "was probably recovering from it when I saw him, because he had regained consciousness"; that when plaintiff came to the hospital "he was in bad shape and was hurt, and later on he found out, I guess, he wasn't so seriously injured; at least he thought he wasn't; he was anxious to get home."

Dr. McGaughey, for plaintiff, testified that he made an X-ray of plaintiff's skull December 23, 1941. "Q. Is it your diagnosis at this time that he did have a skull fracture, from the examination of the X-ray as taken by you? A. The evidence points to a skull fracture."

Cross-examination: "Q. Has it ever occurred to you in those X-rays that those lines which you say indicate skull fracture might not be or might be blood channel lines? A. There ▮▮▮▮ are blood channel lines that are visible on the film, but these lines are of a different character from the blood channel lines."

Dr. Chenoweth, for plaintiff, testified that he examined plaintiff September 27, 1941; that plaintiff complained "of soreness in both knees and muscles of the right neck, and watering of the eyes at times, and had difficulty in crossing his legs; he complained of pain at that time. He gave me a history of being thrown out of a car and knocked unconscious and was removed to Neosho to McDonald hospital, and went home at end of second day, I believe he told me. His examination at that time revealed he had a number of scars over his chest and back and both knees as a result of lacerations and abrasions apparently of recent origin, complained principally of pain around knees and right neck muscles. That was about the extent of the examination." Dr. Chenoweth was shown an X-ray of plaintiff's skull and said that it looked "like an irregular skull fracture through the tables of the skull." He was asked what plaintiff might suffer from "because of that cracked skull", and answered: "Well, of course, a skull injury or any bone injury, sometimes nature, in healing a wound, overdoes it. In the healing process of a bone injury, nature causes a callous to be thrown out, and sometimes instead of giving sufficient callous it keeps on going, and in that case, several years after, due to an excessive amount of callous being thrown out, you see, he might begin to get pressure symptoms, or brain symptoms. · Q. Get pressure symptoms of the brain, which might cause paralysis? A. It can be. It depends upon the nerve centers it is pressing on. Q. It could cause paralysis? A. Yes. We have had that happen. Q. It is a serious situation? A. It can be. . . . Q. Did you ascertain he was complaining about his back, too, Doc-

tor? A. Yes; he complained some of the back. Q. If he has dizzy spells or if he has headaches, that could all be caused by what you saw in exhibit A, couldn't it? A. There can be a disturbance there; yes."

Dr. Kuhn, for defendants, testified that he examined plaintiff December 23, 1941; that the examination "revealed nothing of unusual note" as to his skull and head. "Examination of his chest revealed there were twenty-eight lacerations with scars on the chest ranging from one-half inch in length to five inches in length, a scar on the chin one-half inch in length, a scar on the neck over the right cleido mastoid muscle three-eighths inch long, one scar on the left eyebrow on the temporal end three-eighths of an inch long, on the left foot, on dorsal surface, a scar one and one-fourth inches long, left knee over knee-cap scar one and one-fourth inches long, and one a half inch long, on the right knee there are thirteen scars that are keloid in type ranging from one-half inch to one and one-half inches in length. The examination of the retina in the eye ground was essentially negative, in that there was no engorgement or tortuosity of the blood vessels, there was no fusing or haze to the optic nerve head. There was a typical dark color of the retina, as seen in this type and race of people. The patient in question had 20/20 vision in part in the right eye, and 20/30 part in the left eye. Otherwise, the nerve reflexes were equal and slightly exaggerated over the entire body. I was unable to find any unusual abnormalties or any quality of the nerve reflexes. Q. Did you obtain a history from Curtis Palmer? A. Yes, sir; he gave a history of September 3rd, 1941, that he was riding on a truck loaded with slab boards; the truck got out of control and turned over, and he was thrown off the truck; that he awakened when a lady was putting alcohol on his chest; was taken to Neosho to the hospital; he had a headache every day since the accident for five days; he now has a headache about twice or three times a week. There is some pain in the small of the back; complains of scars on both knees; the patient states he did not have these scars before the accident; the eyes water when he attempts to use them; had to give up playing baseball because his eyes watered all the time; right eye feels or looks like there is something dim in it all the time; he also states he was in the McDonald hospital at Neosho two days following the accident; that the patient was then taken home, and there he stayed in bed for about nine days. Q. That is just the account of what the patient told you? A. Yes, sir. Q. What you have just read. Now, Doctor, you have mentioned with reference to the scars which he claims to have sustained in the accident, you refer to them as 'keloid.' Explain to the court what you mean? A. Keloid tumors is the overgrowth of scar tissue particularly characteristic of the colored races. Q. And in any event a scratch or cut then on the skin in a person of the colored race it causes that over-

growth of scar tissue to form; does it not? A. As a rule. Q. Is there any cure? A. Sometimes it yields to X-ray therapy. Q. Now, those scars appeared on the kneecaps; is that true? A. Yes, sir. Q. And one on the chest? A. Yes, sir. Q. Is there a slight one over the eye? A. Yes, sir. Q. That is all the scars that you observed? A. No. There was one on his chin, I believe I stated. One on his neck, one scar on his chin one-half inch long, and one over right sterno cleido mastoid muscle three-eighths inches long. Q. Those were cosmetic in nature? A. They would detract from his beauty. The result of his scars would be the unsightliness of them; as far as being any permanent damage in regard to his health and comfort, I don't believe they would be.''

Dr. Kuhn further testified: ''Q. Assuming the plaintiff here claims since the accident his vision has been impaired, that he suffers from defective vision which he did not have before the accident, are you able to tell, from your examination of his eyes, whether or not this defective vision existed prior to the time of the accident? A. Well, I did not try to make any refractive course of his eyes at the time of the examination; however, in view of the fact the opthalmoscopic examination of the eyes was negative and that his vision in the right eye was 20/20 and 20/30 in the left eye, I would be inclined to believe it is due to refractive error in his eyes and that he has a congenital type of eyeball, and glasses would probably correct this refractive error. I am rather inclined to believe if this were in result to concussion of the brain there would be engorgement of the blood vessels of the retina and probably there would be a haze and fusing of the outline of the optic nerve head, or at least would be swollen. Q. None of those existed at the time of the examination? A. No. Q. Assuming a skull fracture was sustained, would not that show up in an examination of the eyes? Ordinarily doesn't that do some damage to the tissues of the eyes, something you could observe? A. Skull fracture in itself wouldn't show up in an opthalmoscopic examination of the eyes. If there was a concussion associated with a skull fracture there might be some residual evidence left in the retina of the eye. Q. Assuming that the plaintiff claims that he suffers frequently from watering of his eyes, is it not your opinion that could be corrected by glasses? A. Possibly so. At least, my opinion is it should be attempted.''

Dr. Kuhn further testified that the lines in the X-ray which indicated fracture to Dr. Chenoweth were not fracture lines, in his opinion.

Dr. DeTar, called by defendants, testified: ''Q. I hand you defendants' exhibit A, purporting to be an X-ray photograph or film of the plaintiff's skull taken with the head, the back of the head, on the plate, and ask you to examine that and then tell us whether or not you are able to discern any evidence of an alleged skull fracture?

A. This plate to me gives the appearance of there having been a fracture, possible fracture through the parietal occipital area, which is sort of triangle in shape. Q. Doctor, of course, you know this is a surprise to me. I was under the impression you were or had agreed with Dr. Kuhn. . . . Doctor, isn't there a possibility these lines that you say may indicate skull fracture may not after all be blood vessel lines? A. There is a possibility; but they are very broad and very straight.''

Dr. McDonald was shown exhibit A and said that there was no indication of skull fracture.

From the amount of the judgment it is a fair inference that the trial court found that plaintiff had a skull fracture, and that all the eye trouble was due to the fracture. Plaintiff was before the court who saw him, and saw the condition of his eyes. There is no claim of passion or prejudice as there frequently is in jury trials in personal injury cases. The question of an excessive verdict or judgment in ▉ personal injury cases will never cease to be difficult. Certainty can never exist. It would serve no good purpose to review cases. In the situation, we do not think we should interfere with the amount found by the trial court, an able lawyer of long experience. See Stofiel v. Reid Bros. Express & Transfer Co. (Mo. App.), 35 S. W. (2d) 948; Holman v. Terminal R. Assn. (Mo. App.), 125 S. W. (2d) 527.

The judgment should be affirmed and it is so ordered. *Dalton* and *Van Osdol, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY, C., is adopted as the opinion of the court. All the judges concur.